**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amerisure Mutual Insurance Company, a Michigan company,<br><br>Plaintiff,<br><br>v.<br><br>Houston Casualty Company, a Texas company,<br><br>Defendant. | CV-17-02269-PHX-DGC<br><br>**ORDER** |

Plaintiff Amerisure Mutual Insurance Company ("Amerisure") filed a complaint against Defendant Houston Casualty Company ("HCC"), and HCC counterclaimed. Docs. 1-1; 35. Both parties now move for summary judgment. Docs. 63; 65. The motions are fully briefed, and oral argument will not aid in the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For the following reasons, the Court will grant Amerisure's motion on HCC's duty to indemnify, HCC's duty to defend, and the lack of Amerisure's duty to indemnify, and deny both parties' motions on Amerisure's duty to defend.

**I.   Background.**

The following facts are undisputed unless otherwise noted. On April 14, 2014, the tenant in Unit 803 at University House, located at 323 East Veteran's Way, Tempe, Arizona ("the Property"), reported to building management that his air conditioning was not

working. Doc. 64-1 at 1.[1] Shawn Albright, who was with the Property's building management, arrived with Troy AuBuchon, an employee of Spectrum Mechanical and Service Contractors ("Spectrum"). Doc. 64-2 at 3-4. When AuBuchon removed the wall panel to access the air conditioning unit, he and Albright observed a pipe joint in the wall with black tape and a hose-clamp on it. Doc. 64-2 at 5. The parties dispute whether the pipe joint was leaking when AuBuchon first saw it or whether it began leaking once he removed the air conditioning unit from the wall opening. Docs. 67 at 5 ¶ 23; 71 at 4; 67-6 at 21, 39-40, 44. AuBuchon cut and bent back the unit side panel and placed sheet metal beneath the pipe joint to collect the leaking water. Doc. 64-2 at 6. He immediately called Spectrum management to report the leak. Doc. 64-2 at 7.

Spectrum employees Brett Van Dreel, Christopher Thornhill, and Matt Kinard arrived and discussed with AuBuchon how to address the leaking pipe joint. Doc. 64-2 at 7. HCC asserts, and Amerisure disputes, that Thornhill removed the tape and clamp from the pipe joint and then later reapplied them. Docs. 64-2 at 7-8; 67-5 at 14. The Spectrum employees decided to wait until the next day to repair the pipe joint because no company was available that afternoon to freeze the pipe, a step necessary before repairs could be made because the pipe had no cut-off valve to stop the flow of water. Docs. 64-3 at 2; 64-4 at 2. As a result, AuBuchon repaired only the air conditioning unit. Doc. 64-2 at 8. As AuBuchon placed the unit back in the wall opening, the pipe joint failed and a high volume of water sprayed under high pressure into the room and building, causing substantial damage to the Property ("the loss"). Doc. 64-2 at 8.

Both of the parties to this case provided insurance coverage to Spectrum. Defendant HCC issued an Owner Controlled Insurance Policy ("the HCC Policy") to the Property's developer, Core Campus Tempe 1, LLC ("Core"). Doc. 64-5 at 10. The HCC Policy was effective from January 6, 2012 to January 6, 2014, and also provided coverage during an "extended products-completed operations period." Doc. 63 at 10. Core later sold the

---

[1] Citations to the docket are to page numbers attached to the top of each page by the Court's electronic filing system, not to page numbers in the original documents.

Property to InvenTrust Properties Corp. ("InvenTrust"), which sustained the loss from the water damage in April 2014. Doc. 67-4 at 2.

Core's general contractor hired Spectrum as the HVAC and plumbing subcontractor for the Property's original construction. Docs. 1-1 at 3; 35 at 2; 67-1 at 23-24. The HCC Policy covered Spectrum as an "enrolled contractor" under the Wrap-up Program Change Endorsement ("Wrap Endorsement") for its installation work at the Property during construction. Doc. 35 at 3. Spectrum did all original HVAC-related work, including installation of pipes, ductwork, equipment, fans, and controls, and its work was warrantied through August 1, 2014. Docs. 67-1 at 22-24. Spectrum did no work on Unit 803's air conditioning between original installation and April 14, 2014. *Id.* at 25.

Plaintiff Amerisure issued an insurance policy to Spectrum for the period from January 1, 2014 to January 1, 2015 ("the Amerisure Policy"). Doc. 64-6 at 1.

After failing to resolve damage claims from the burst pipe, InvenTrust sued Spectrum in an underlying lawsuit and Amerisure defended under a reservation of rights.[2] Docs. 64-7 at 2; 67-4. Amerisure made payments of more than $212, 814.76 in the underlying lawsuit before learning of the HCC Policy. Docs. 67-12 at 3; 67-13. HCC denied coverage, but later agreed to defend Spectrum under a reservation of rights, although Amerisure asserts that HCC never actually paid any defense costs. Docs. 64-7 at 2; 65 at 11-12; 67-17. Both HCC and Amerisure paid a portion of Spectrum's eventual settlement with InvenTrust. Doc. 65 at 12.

Amerisure now sues HCC to recover 50% of the expenses it incurred defending Spectrum and settling the underlying lawsuit. Docs. 1-1; 67 at 10.[3] HCC counterclaims, seeking to recover money paid under its policy. Doc. 35.

/ / /

---

[2] InvenTrust was formerly known as Inland American Real Estate Trust, Inc. Amerisure's complaint refers to the underlying lawsuit as the Inland Lawsuit. Doc. 1-1.

[3] Amerisure also sued Spectrum in this case, and Spectrum counterclaimed against Amerisure and crossclaimed against HCC. Spectrum's counterclaims were dismissed with prejudice (Docs. 43; 62), and Spectrum was voluntarily dismissed without prejudice from Amerisure's declaratory relief claims (Doc. 62).

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Discussion.

Amerisure's Count 1 seeks a declaration that it had no duty to defend or indemnify Spectrum in the underlying lawsuit. Doc. 1-1 at 13. Count 2 seeks a declaration that HCC had a duty to defend and indemnify Spectrum under the HCC Policy and Wrap Endorsement. *Id.* at 13-14. Counts 3 and 4 seek equitable indemnity and subrogation, and equitable contribution, respectively. *Id.* at 14-15. HCC's counterclaims seek equitable subrogation and contribution. Doc. 35 at 7-8. The parties cross-move for summary judgment on all claims. Docs. 63; 66.

### A. Duty to Defend.

HCC concedes that it had a duty to defend Spectrum and agrees to pay 50% of defense expenses. Docs. 67 at 10 ¶ 64; 71 at 11 ¶ 64. The Court will enter judgment on Count 2 in favor of Amerisure with respect to HCC's duty to defend Spectrum, but the percentage of defense expenses owed by HCC depends on whether Amerisure also had a duty to defend Spectrum.

Amerisure makes no distinct arguments regarding its own duty to defend, and HCC does not address Amerisure's duty to defend separately from its duty to indemnify. And yet the duties to defend and indemnify are not the same. *See Stillwater Ins. v. Dunn*, No. CV-14-01829-PHX-DGC, 2015 WL 1778349, at *3 (D. Ariz. Apr. 20, 2015). "The scope of the duty to defend under an insurance policy can be broader than the scope of the duty to indemnify." *Lennar Corp. v. Auto–Owners Ins. Co.*, 151 P.3d 538, 543 (Ariz. Ct. App. 2007). Because the parties fail to address Amerisure's duty to defend, the Court will deny their motions for summary judgment with respect to this duty.

### B. Duty to Indemnify.

HCC argues that there was no "occurrence" under its Policy, Spectrum's faulty repair work on April 14, 2014 was the proximate cause of the loss, and only the Amerisure Policy covers the loss. Doc. 63. Amerisure responds that the HCC Policy covers the loss because there was an "occurrence" under the HCC Policy and the loss falls within the "products-completed operations hazard" and extended coverage period; Spectrum's defective original work and installation are the proximate causes of the loss; the HCC Policy applies even if repairs on April 14, 2014 caused the loss; and an exclusion in the Amerisure Policy precludes coverage. Doc. 66.

#### 1. Undisputed and Disputed Facts.

HCC asserts that the pipe rupture on April 14, 2014 was caused by the negligence of Spectrum employees on that date. Doc. 63 at 4, 10. HCC identifies little or no facts to support this assertion. In contrast, Amerisure cites substantial evidence that the pipe rupture was caused by Spectrum's negligence at the time of original installation.

For example, Christopher Thornhill testified to the following. On April 14, 2014, he was Spectrum's piping superintendent, overseeing piping installation, repair, soldering, and support. Doc. 67-5 at 5-7. Before the pipe burst, Thornhill had visited the Property three to four times to address issues with unsupported piping in other units. Inadequately supported piping was a building-wide problem at the Property, and Spectrum was in the process of adding additional supports. *Id.* at 8. In about twenty years of experience,

Thornhill had seen tens of thousands of pipe joints. *Id.* After inspecting the burst pipe from Unit 803, Thornhill found that it was soldered incorrectly. With a 3/4-inch copper pipe – the size and type of the pipe that burst – proper soldering should continue the full length of the fitting. Thornhill found during his inspection that the solder in the joint did not continue all the way down the pipe, covering "maybe a 16th of the joint," and the joint had no solder at the top. *Id.* at 14-16. Thornhill repeatedly testified that based on his observations of the Property's piping and repairs leading up to the loss, the pipe joint in Unit 803 was inadequately supported and soldered. Doc. 67-5 at 16-19.

Other Spectrum employees who saw the pipe joint testified similarly. AuBuchon stated that "there was not nearly enough solder pushed into the joint." Doc. 67-6 at 60-61. Van Dreel testified that the joint "was not slid back into the coupling far enough . . . the pipe was not back far enough in the joint." Doc. 67-9 at 32-33. Jeffrey Wheelock, Spectrum's owner, stated:

> Just from my observation, it appeared that it was not soldered properly. It [was] real black where it may have been overheated. You know when you're soldering a joint, you know, you heat the pipes, that sucks the solder into the joint, and so sometimes you can overheat it and it will – it won't solder properly. So I remember seeing [how] black it was, and I thought, well, it looks like it may have been overheated. But that's just my observation.
>
> And I did see that the solder [was] not a complete solder joint. . . . [O]n this one, I saw on the pipe joint, you know, it didn't look like it was a full solder joint. . . . [T]hat pipe didn't appear to be a complete solder joint.

Doc. 67-1 at 37-40. Wheelock testified further that "[t]here [was] no doubt in [his mind] that" improper soldering contributed to the pipe burst. *Id.* at 40. Although he speculated whether third parties or other causes contributed, he agreed that "if it [were] a healthy joint, no one [would have] put tape and clamp on it," and whoever applied the tape and clamp did so because the pipe was already leaking. *Id.* at 40-43. Along with other Spectrum employees, Wheelock observed mineral buildup on the pipe joint indicating a long-term water leak. Docs. 67-1 at 43-44; 67-5 at 16; 67-9 at 43.

1 HCC contends that Spectrum employees' negligent repairs of the air conditioning and "AuBuchon's replacement of the [air conditioning unit] back in the cabinet" caused the pipe to burst. Docs. 63 at 11-12; 70 at 4-5. As supporting evidence, HCC cites paragraphs 4 to 16 of its statement of facts which include mostly undisputed facts about the sequence of events before the pipe rupture. Doc. 63 at 11. Within HCC's cited support, the Court identifies two apparent factual disputes. The parties appear to disagree on whether the pipe joint was leaking when AuBuchon first saw it on April 14, or whether it began leaking once he pulled the air conditioning unit from the wall opening. Docs. 67 at 5 ¶ 23; 71 at 4; 67-6 at 21, 39-40, 44. They also dispute whether a Spectrum employee touched the pipe and removed and then replaced the clamp and tape, further disturbing the leaking pipe joint. Docs. 67-5 at 14; 64-2 at 7-8; 67 at 6; 71 at 6. For reasons explained below, the Court cannot conclude that these factual disputes preclude the entry of summary judgment on the parties' duties to indemnify Spectrum.

## 2. Admissibility of Spectrum Employees' Testimony.

As discussed above, Spectrum's owner and employees testified about the failed pipe joint's soldering, their observations of the Property's piping, and their opinions about the improperly soldered and supported pipe joint as the cause of the loss. *See* Doc. 67 at 3-9. HCC argues that evidence about the Property's piping outside of Unit 803 is irrelevant and misleading. *See* Docs. 67 at 3-4; 71 at 3-4. HCC also asserts that the employees' testimony about the appearance and condition of the pipe joint and any inferences they drew from what they saw at the Property is improper and undisclosed expert testimony. *See* Docs. 67 at 4-9; 71 at 4-9. Amerisure responds that the evidence is relevant fact witness testimony. Doc. 72 at 3.

The Court disagrees with HCC's claim that evidence of improperly supported and soldered piping in the Property's other units is irrelevant and misleading. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 401 is "a low threshold for relevance, because '[a]ny more stringent

requirement is unworkable and unrealistic.'" *Griffin v. Union Pac. R.R. Co.*, No.: 1:17-cv-0384-JLT, 2018 WL 6592776, at *11 (E.D. Cal. Dec. 14, 2018) (quoting Fed. R. Evid. 401 advisory committee's note to 1972 amendment). Evidence that piping installed in other units by Spectrum during construction of the Property was improperly soldered and supported makes it more probable that the pipe joint in Unit 803 was also defectively installed. It plainly is relevant.

Whether testimony about the pipe joint's condition and the cause of the failure constitutes undisclosed expert testimony depends on whether it is admissible under Federal Rule of Evidence 701. The rule states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issues; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Each witness inspected the failed pipe joint, has substantial experience in soldering and installing pipe joints, and opined on the cause of the leak based on his observations of the failed pipe. The testimony clearly is based on the witnesses' perceptions as required by 701(a). And it would be helpful in determining the cause of the leak as required by 701(b). The key question, then, is whether, under Rule 701(c), the testimony of the Spectrum employees is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

The Ninth Circuit has explained that "the line between lay and expert opinion depends on the basis of the opinion, not its subject matter." *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017). The criminal defendant in *Barragan* argued on appeal that the trial court had improperly allowed law enforcement agents to testify under Rule 701

- 8 -

about the meaning of code words used by participants in a criminal conspiracy. The Ninth Circuit held that the agents' opinions about the meaning of the code words were properly admitted as lay opinion testimony under Rule 701 because the agents testified on the basis of their observations during the criminal investigation. *Id.* The Ninth Circuit has also held that lay opinion testimony includes knowledge obtained through the witness's profession. *See United States v. Crawford*, 239 F.3d 1086, 1089-91 (9th Cir. 2001) (permitting employee witness to offer lay testimony under 701 about UCLA's definition of "affiliated organization" where opinion was based on his experience with UCLA's policies and usage of term, and he did not testify to the term's legal definition or ultimate legal conclusion).

The Spectrum employees clearly may testify about their observations on April 14, 2014, the leaking observed from the pipe joint before the rupture, the need to place sheet metal under the joint to catch the leaking water, the tape and clamp on the pipe when they arrived, the mineral buildup and discoloration, the amount and length of solder at the joint, and the lack of support for the pipe. The employees can also testify about problems they had observed elsewhere in the Property from unsupported and inadequately soldered copper pipe. Such testimony not only falls within cases like *Barragan* and *Crawford*, it is a "prototypical example of the type of evidence contemplated" by Rule 701 like "the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and [the] endless number of items that cannot be described factually in words apart from inferences." Fed. R. Evid. 701 advisory committee's note to 2000 amendment (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng' g*, 57 F.3d 1190, 1196 (3d Cir. 1995)).

The Court need not decide whether the employees could also state their opinions that the faulty installation caused the pipe joint to rupture on April 14, 2014. For reasons explained below, summary judgment must be granted even in the absence of such opinions.

### 3. HCC Policy Language.

The HCC Policy provides coverage for property damage "caused by an 'occurrence' that takes place in the 'coverage territory.'" Doc. 64-5 at 19. Although the policy period

ended on January 6, 2014, the Wrap Endorsement provides coverage during the "extended products-completed operations period" for property damage that falls within "the products-completed operations hazard." Docs. 63 at 10; 64-5 at 53. The parties do not dispute that the products-completed operations period was in effect at the time of the pipe rupture on April 14, 2014.

The "products-completed operations hazard" includes all property damage "arising out of 'your product' or 'your work,'" except "[w]ork that has not yet been completed[.]" Doc. 64-5 at 33. "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." *Id.* Thus, the fact that the HVAC system installed by Spectrum required continuing maintenance does not mean that it was not completed work. And the parties agree that Spectrum's original HVAC installation at the Property was completed in August 2013, during the original Policy period. Doc. 67 at 3, 10; 71 at 2, 11.

The HCC Policy defines "property damage" as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Doc. 64-5 at 33. The parties do not dispute that the water damage to the Property constitutes property damage within this definition.

As noted above, property damage must be "caused by an 'occurrence' that takes place in the 'coverage territory.'" Doc. 64-5 at 19. The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 32.

For the HCC Policy coverage to apply in this case, there must have been (1) property damage (2) caused by an occurrence (3) at the covered project (4) during the "products-completed operations period," which period applies only to (5) loss from a "products-

completed operations hazard," which includes (6) property damage "arising out of" Spectrum's completed product or work. Doc. 64-5 at 19, 52. The parties agree that all of these requirements are satisfied, with two exceptions.

First, HCC argues that the "occurrence" is the cause of the loss and that it must occur during the original policy period. HCC argues that the cause of the loss was the negligence of Spectrum's employees on the date of the rupture, which did not happen within the original policy period. Docs. 63 at 10-14; 70 at 4.

The Court does not agree with this interpretation of "occurrence." As noted above, the policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Doc. 64-5 at 32. The "accident" in this case was not the faulty work of Spectrum employees; it was the pipe joint rupture that flooded the Property. This interpretation is evidenced from the plain meaning of the word "accident" and comports with Arizona law. *See Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 545-46 (Ariz. Ct. App. 2007) (when "accidental" property damage results from continued exposure to faulty construction, that property damage is an "occurrence" as defined by the plain terms of the policy"). And there is nothing in the Policy which states that the occurrence must happen within the Policy period. The only stipulation is that it must occur in the "coverage territory" (Doc. 64-5 at 19), which it admittedly did. In short, the Court cannot accept HCC's understanding of "occurrence" or its contention that the occurrence must happen during the original policy period. The whole intent of the products-completed operations hazard is that the Policy continues to protect against accidents that arise from work completed by Spectrum within the policy period.[4]

Second, although HCC does not frame the argument in this way, for property damage to fall within the products-completed operations hazard it must have arisen out of Spectrum's competed work at the Property – its original installation of the HVAC system

---

[4] Even if HCC's view of "occurrence" were accepted, it would not defeat coverage by the HCC Policy. As explained in the paragraphs that follow, any reasonable jury would conclude that the property damage arose out of Spectrum's faulty work during the original policy period. Thus, even if the "occurrence" was Spectrum's negligence and it had to occur within the original policy period, any reasonable jury would find that it did.

- 11 -

during the Property's construction. Doc. 64-5 at 33. HCC argues that it did not – that the rupture was proximately caused by Spectrum's negligence on April 14, 2014. This argument is defeated by Arizona insurance law and the undisputed facts of this case.

The products-completed operations hazard, which triggers the extended period of insurance coverage, includes all property damage "arising out of" Spectrum's completed product or work. Doc. 64-5 at 33. Arizona courts apply a broad meaning to the phrase "arising out of" when it appears in an insurance policy. As the Arizona Court of Appeals has explained on more than one occasion, "[i]n interpreting 'arising out of' language, we have not required direct proximate cause . . . but only some causal relation or connection between the two." *Lennar*, 151 P.3d at 548 n.12 (quotation marks omitted) (quoting *Salerno v. Atl. Mut. Ins. Co.*, 6 P.3d 758, 762 (Ariz. Ct. App. 2000)).

Given the undisputed facts testified to by the Spectrum employees, no reasonable jury could conclude that there was no causal relation or connection between Spectrum's original installation of the HVAC system and the rupture that occurred on April 14, 2014. The undisputed observations of these employees, which are plainly admissible under Rule 701 as explained above, compel such a conclusion. These include the leaking seen from the pipe joint before the rupture, the need to place sheet metal under the joint to catch the leaking water, the tape and clamp on the pipe when the employees arrived, the mineral buildup and discoloration on the pipe joint, the amount and length of solder at the joint, the lack of support for the pipe, and problems the employees had observed elsewhere in the building from unsupported copper piping. Thus, even if the employees were not allowed to opine on the ultimate cause of the April 14, 2014 rupture under Rule 701(c), any reasonable jury would find from their admissible observations that Spectrum's original installation had a "causal relation or connection" to the rupture. *Lennar*, 151 P.3d at 548 n.12. Nothing more is needed for the property damage to have arisen out of Spectrum's work as required by the HCC Policy.

And even if HCC prevailed on the only two factual issues in this case – whether the pipe joint was leaking when AuBuchon first saw it on April 14 or began leaking after he

pulled the air conditioning unit from the wall, and whether a Spectrum employee removed and then replaced the tape and clamp – it would not produce a different result. Given the undisputed observations of the Spectrum employees, the precise timing of the leak on April 14 and the removal and replacement of the tape and clamp would not defeat the inescapable conclusion that the pipe's original installation had a causal relation or connection to the rupture. Summary judgment is warranted because the disputed evidence in this case would not permit a reasonable jury to return a verdict in favor of HCC on the coverage of its Policy. *See Anderson*, 477 U.S. at 248 (to defeat summary judgment, the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party.").

In sum, on the facts presented by the parties, the Court concludes that the property damage in this case arose out of Spectrum's original installation of the pipe, which constituted completed work within the completed-products operations hazard and the completed-products operations period. The property damage was therefore covered by the HCC Policy.

### 4. Coverage under the Amerisure Policy.

The insurance policy that Amerisure issued to Spectrum provides that it:

> does not apply to . . . "property damage" arising out of either your ongoing operations or operations included within the "products completed operations hazard" if such operations were at any time included within a "controlled insurance program" for a construction project in which you are or were involved.

Doc. 66 at 17 (citing Doc. 64 at 8). As in the HCC Policy, "products-completed operations hazard" includes property damage "arising out of 'your product' or 'your work.'" Doc. 64-6 at 35. In pertinent part, the Amerisure Policy also defines "property damage" and "occurrence" in the same way as the HCC Policy *See id.*

HCC concedes that "the Amerisure Policy excludes coverage for property damage which arises out of ongoing operations or operations included within the HCC Policy

'products-completed operations hazard.'" Doc. 63 at 13.[5]  Because the Court finds that the property damage in this case is included within the HCC Policy's products-completed operations hazard, it is not covered by the Amerisure Policy.

### 5. Conclusion.

The Court will grant Amerisure's motion for summary judgment and deny HCC's cross-motion on Counts 1 and 2 with respect to both parties' duties to indemnify. The Court holds that HCC has a duty to indemnify and Amerisure does not.

## C. Equitable Indemnity, Contribution, and Subrogation Claims.

The Court will not parse the parties' claims to determine the viability of their various theories of recovery. In any event, Amerisure is entitled to amounts it paid to settle the claims against Spectrum.

The Court will therefore grant summary judgment in favor of Amerisure and against HCC on Amerisure's claims for equitable indemnity, subrogation, and contribution, and on HCC's counterclaims for equitable subrogation and contribution, with respect to amounts paid to settle the claims against Spectrum in the underlying litigation. The Court will deny summary judgment to both parties on Amerisure's claims for equitable indemnity, subrogation, and contribution, and on HCC's counterclaims for equitable subrogation and contribution, with respect to amounts paid to defend Spectrum in the underlying litigation.

**IT IS ORDERED**:

1. Plaintiff's motion for summary judgment (Doc. 66) is **granted in part** and **denied in part** as set forth above.

2. Defendant's motion for summary judgment (Doc. 63) is **denied**.

3. The Court will hold conference with the parties for the purpose of setting a trial date for the duty to defend claims on **March 19, 2019 at 2:00 p.m.** Counsel for Plaintiff shall initiate a conference call to include counsel for all parties and the Court. If

---

[5] HCC argues that the exclusion does not apply only because the loss was caused by "Spectrum's faulty repair attempts on April 14, 2014." Doc. 63 at 13-14.

a dial-in number is to be used, counsel for Plaintiff shall provide the dial-in information to counsel for all parties and the Court no later than **March 18, 2019 at 5:00 p.m.**

Dated this 4th day of March, 2019.

*David G. Campbell*
David G. Campbell
Senior United States District Judge